UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | No. 1:06-CR-76-02 |
| v. ) | |
| ) | Chief Judge Curtis L. Collier |
| ) | |
| MARK ESTELL WILKINS ) | |

**MEMORANDUM**

Before the Court is defendant Mark Estell Wilkins' ("Defendant") Motion for Judgment of Acquittal or in the Alternative for a New Trial (Court File No. 37), pursuant to Fed. R. Crim. P. 29. Defendant claims four grounds for acquittal or a new trial: (1) there was insufficient evidence to support the jury's verdict; (2) the statute under which he was convicted does not apply to a false Department of Housing and Urban Development ("HUD") settlement statement (a "HUD-1"); (3) the jury should not have been charged under *Pinkerton v. United States*, 328 U.S. 640 (1946); and (4) the jury should have been charged with the United States Court of Appeals for the Sixth Circuit's form instruction for wire fraud. For the following reasons, this Court finds no merit in Defendant's claims. Accordingly, this Court will **DENY** Defendant's motion for judgment of acquittal and will **DENY** Defendant's motion for a new trial (Court File No. 37).

I.  **FACTS AND PROCEDURAL HISTORY**

Defendant was indicted with codefendant Jay Ann Snyder ("Snyder") on four counts (Court File No. 1). Counts One and Two charged Defendant with wire fraud, in violation of 18 U.S.C. § 1343. According to the indictment Defendant and Snyder defrauded mortgage lenders by purchasing

real properties using false HUD-1 settlement statements, which reflected inflated sales prices and fees (*id*.). Snyder was a mortgage broker and would prepare the documents. Defendant's role was to act as buyer using Snyder as broker, knowing she would cause a duplicate set of settlement forms to be prepared (*id*.).[1] As a result of these actions, the mortgage lender would disburse more money than it otherwise would have loaned; the excess money was split between Defendant and Snyder and sometimes allegedly disguised using an entity known as Century Processing. The indictment alleges that on two specific occasions, Snyder, aided and abetted by Defendant, used wire communications to further this fraudulent scheme (*id*.).

Counts Three and Four charged Defendant with aiding and abetting the making of false and fraudulent statements to HUD on HUD-1 forms in violation of 18 U.S.C. §§ 1001 & 2 (*id*.). Under the Real Estate Settlement Procedures Act of 1974 ("RESPA"), 12 U.S.C. §§ 2601 *et seq*., "HUD-1s" are required to be included at all real estate settlements. 12 U.S.C. § 2603. The indictment alleges two occasions in which an inflated purchase price was included on HUD-1 forms (*id*.).

After pleading "not guilty," Defendant proceeded to trial by jury commencing on January 22, 2007. The trial lasted two days and included testimony from codefendant Snyder (Court File No. 38) on Defendant's behalf. At the close of the Government's proof, Defendant moved for

---

[1] At trial, the Government described the scheme this way:
[T]hey did it with what they call the 'double HUD.'. . . what they would do is to create two [HUD-1 Forms]. One would be true, that they'd give the seller; and the other would be false, which they would give the lender. The false one would have the higher price – a higher sales price and some other false items on it. . . .

So, in other words, Mr. Wilkins is buying a piece of property, and he's paying for the property, he's getting money from a lender to buy the property, but not only is he buying the property, but he's getting additional money in his pocket.
(Court File No. 38 p. 5-6.)

judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 (*id*. at p. 70-76). The Court orally denied the motion as to Counts One and Two, holding the Government had put on sufficient evidence to establish Defendant's willful fraudulent intent (*id*. at p. 76). The Court reserved ruling as to Counts Three and Four, to further consider whether the loans at issue were within HUD's jurisdiction as required by 18 U.S.C. § 1001 (*id*.). The Court did not rule on this motion prior to the jury's verdict, finding Defendant guilty of all four counts (Court File No. 36).

On January 30, 2007, Defendant timely filed his Rule 29/33 motion (Court File No. 37). On February 2, the United States of America (the "Government") timely filed a response (Court File No. 39). On February 6, the Government filed a supplemental response (Court File No. 40).

## II. STANDARD OF REVIEW

### A. Motion for Judgment of Acquittal under Rule 29

Under the Federal Rules of Criminal Procedure, the defendant may move for judgment of acquittal within seven days of the jury's discharge. Fed. R. Crim. P. 29(a). Such a motion should be granted if "the evidence is insufficient to sustain a conviction." *Id*. In reviewing such a challenge to the sufficiency of the evidence, the Court determines, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (original emphasis). In coming to this determination, the court does not weigh the credibility of witnesses or the weight of the evidence. *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002). "A defendant bringing such a challenge bears a 'very heavy burden.'" *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.

1986)).

If, as here, a court reserves ruling on a motion for judgment of acquittal, the court may decide the motion after the jury returns a verdict of guilty, on the basis of the evidence *at the time the ruling was reserved*. Fed. R. Crim. P. 29(b); *United States v. Finn*, 375 F.3d 1033, 1037 (10th Cir. 2004).

### B. Motion for a New Trial under Rule 33

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The decision to order a new trial is committed to the Court's discretion; an appellate court will reverse only upon a defendant demonstrating clear abuse of discretion. *United States v. Talley*, 164 F.3d 989, 1002 (6th Cir. 1999); *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994). A reviewing court looks most closely at the essential fairness to the accused of the prior proceedings in deciding whether to grant a Rule 33 motion. *See Davis*, 15 F.3d at 531-32.

When considering whether to grant a new trial based on the sufficiency of the evidence, the Court may consider the credibility of witnesses and the weight of the evidence to ensure there is not a miscarriage of justice. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998) (citing *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988)). Rule 33 motions are generally disfavored and the Court should grant such a motion "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *Ashworth*, 836 F.2d at 266; *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991); *United States v. Hoffa*, 382 F.2d 856, 862 (6th Cir. 1967). A defendant bears the burden of proving a new trial should be granted. *Seago*, 930 F.2d at 488.

4

## III. ANALYSIS

### A. Elements of the Offenses

Counts One and Two of the indictment allege wire fraud. To convict a defendant of wire fraud, the Government must establish the following elements beyond a reasonable doubt:

(1) A scheme or artifice to defraud;

(2) Use of interstate wire communications in furtherance of the scheme; and

(3) Intent to deprive a victim of money or property.

*Daniel*, 329 F.3d at 485 (quoting *United States v. Prince*, 214 F.3d 740, 747-48 (6th Cir. 2000)). A scheme or artifice to defraud "includes any plan or course of action by which someone intends to . . . deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479 (6th Cir. 1999). "Intent" is defined as a specific intent to induce the victim to part with his or her property or to undertake some action that he or she would not otherwise undertake absent the fraud. *Daniel*, 329 F.3d at 487. "[T]he question of intent is generally considered to be one of fact to be resolved by the trier of the facts . . . and the determination thereof should not be lightly overturned." *Id*.

Counts Three and Four of the indictment allege aiding and abetting and false or fraudulent material statements made in any matter within the jurisdiction of the United States Government. 18 U.S.C. § 1001. To prove this offense the Government must establish the following five elements beyond a reasonable doubt:

(1) The defendant made a statement;

(2) Such statement was false, fictitious or fraudulent;

(3) Such statement was material;

(4) The Defendant made such statement knowingly and willfully; and

(5) The false, fictitious, or fraudulent statement pertained to a matter or activity within the jurisdiction of a federal agency.

*United States v. Steele*, 933 F.2d 1313, 1318-19 (6th Cir. 1991). The false statement need not be made directly to the federal agency. *United States v. Gibson*, 881 F.2d 318, 322 (6th Cir. 1989). A statement is material if it tends to or is capable of influencing a federal agency; however, the Government does need not to prove the agency actually relied on the statement. *United States v. Gaudin*, 515 U.S. 506, 509 (1995); *Lutz*, 154 F.3d at 588 (citing *United States v. Blandford*, 33 F.3d 685, 705 (6th Cir. 1994)). A statement comes "within the jurisdiction of a federal agency" when the agency has power to exercise authority in a particular matter, as distinguished from a matter peripheral to the business of that agency. *United States v. Davis*, 8 F.3d 923, 929 (2nd Cir. 1993). Jurisdiction should not be defined narrowly or in a strictly technical sense. *United States v. Rodgers*, 466 U.S. 475, 480 (1984).

Under the "aiding and abetting" statute, whoever "aids, abets, counsels, commands, induces or procures [commission of an offense] is punishable as a principal." 18 U.S.C. § 2. The evidence does not need to show Defendant himself committed the crimes; if a rational jury could find, beyond a reasonable doubt, (1) another person committed the offenses charged to Defendant, (2) Defendant assisted such person in the commission of the offenses, and (3) Defendant intended to aid and abet his codefendant in commission of such offenses, then Defendant may be punished as a principal. *Id*.; *see also* Sixth Circuit Dist. Judge's Ass'n, Criminal Pattern Jury Instructions § 4.01 (2005 ed.).

**B. Sufficiency of the Evidence**

Defendant alleges "[t]he weight of the evidence does not support the jury verdict," (Court File No. 37), without further explicating this deficiency. In making his original Rule 29 motion, at

the close of the Government's evidence, the Defendant objected that (1) the Government's evidence did not establish Defendant's intent to devise a scheme to defraud and to obtain property by false pretenses, and (2) the Government's proof was deficient on the false statement claims because the false statements were not within a federal agency's jurisdiction (Court File No. 38, p. 71-74). In responding to Defendant's claims, the Government cites the statements of codefendant Snyder, who testified for the defense. The Government points out that Snyder pleaded guilty on the same charges and admitted at trial there was a scheme to defraud (Court File No. 39, p. 1-2) and Defendant acted as a buyer, which appeared to further the scheme. In support of the verdict as to Counts Three and Four, the Government notes that two other participants in the scheme, Snyder and former Executive Title co-owner Angela Byrd ("Byrd"), a witness for the prosecution, both admitted the HUD-1 forms contained false representations and were required by federal law and regulation to be included in every closing (*id*. at p. 2). As to Count Four, the Government argues there was sufficient evidence to conclude Defendant was a knowing participant who profited from the scheme and from that transaction, such that a rational jury could find the Defendant guilty beyond a reasonable doubt (*id*.).

    **1.**    **Counts One and Two**

This Court must evaluate the evidence with a view to Defendant's prior objection – that the evidence does not support a finding of specific intent – and analyze whether the evidence showed Defendant knew of the scheme to defraud, entered into it knowingly and willingly, and acted, pursuant to the scheme, to obtain excess funds that would not otherwise have been loaned given the lower selling prices of the properties. The Government and Defendant focus on Snyder's testimony. Snyder's statements at trial on direct examination affirm there was a scheme to defraud, but suggest Defendant did not know he was signing fraudulent HUD-1 forms when he completed the buyer's

7

paperwork (Court File No. 38, p. 84). However, on cross, Snyder admitted she pleaded guilty to Count One of the indictment, which alleged a fraudulent scheme between herself, Defendant, and others (*id*. at p. 89). She admitted to splitting the fraud proceeds with Defendant (*id*. at 93-94). She also agreed that Defendant had obtained checks on his own bank accounts to further the property purchases, and he had endorsed down-payment checks which were returned by Byrd (*id*. at 95-100).

In short, Snyder's testimony cuts both ways. It is ambiguous, and when it is compared to the straightforward testimony of Byrd and Anthony Tuggle ("Tuggle"),[2] an FBI agent and forensic accountant who interviewed Defendant, it is clear there was more than sufficient evidence for a rational jury to find the existence of a scheme to defraud and to find Defendant possessed a specific

---

[2] Byrd, a co-conspirator who testified for the Government, co-owned the title company which handled the double-HUD closings. Byrd testified it was standard practice for both herself and her partner to walk double-HUD buyers through the specifics of both the real and fraudulent HUD-1 forms (Court File No. 38, p. 28). On cross-examination, Byrd testified she did not recall the exact closings at issue, but reconfirmed her common practice and recalled meeting Defendant "eight or nine times" under such circumstances. (*Id*. at p. 41-42.) ("Q: [S]o you're saying you explain each piece of paper to the buyer? A: Yes, we do. Q: Even including where you're asking them to make a false statement? A: Yes, sir.")

Byrd testified that Defendant *knew* he was receiving excess funds. (*Id*. at p. 24) ("Q: And were you or your partner responsible for writing the checks to him to give him his money back or to give him his part of the excess? A: Yes, we were. Q: And that excess is what? Where is that money coming from that you're writing checks to him? A: From the lender.")

Tuggle interviewed Defendant during the course of his investigation, and testified as to Defendant's admissions during the interview. In answer to Tuggle's questions, Defendant admitted: (1) he had negotiated sales prices for the properties he purchased; (2) he had attended all the closings for these properties; (3) he knew he was borrowing more money than was warranted by the sales prices on the properties; and (4) he physically received money back from the loans, which he used to renovate the properties and also to purchase all-terrain vehicles and renovate his home. (*Id*. at p. 62-63.)

The Court concludes a rational jury could discern Defendant's knowledge and specific intent beyond a reasonable doubt from this combined testimony.

intent to obtain excess, unsecured funds from the mortgage lenders. *Accord Daniel*, 329 F.3d at 488; *see also United States v. Birnie*, 193 F. App'x 528, 535 (6th Cir. 2006) (evidence was sufficient to convict a defendant whose role in the wire fraud was to act as the buyer) (citing *United States v. Crossley*, 224 F.3d 847, 857 (6th Cir. 2000) (defendants were approached by insurance adjustor and agreed to participate in filing false claims; defendants' only involvement was to provide their names and mailing addresses to the principal and to cash the claim checks; the court upheld the defendants' convictions because a rational juror could have concluded they knowingly participated in the scheme when it should have been obvious to them they were not entitled to the claim money).

### 2. Counts Three and Four

As outlined above, to support a conviction under 18 U.S.C. § 1001 the Government must prove Defendant knowingly and willfully made a material false statement regarding a matter within a federal agency's jurisdiction. *United States v. Kingston*, 971 F.2d 481 (10th Cir. 1992). Defendant challenged the "jurisdiction" element in his prior objection, and this Court will address jurisdiction below. As to the factual sufficiency of the evidence, the Government offered evidence from both Byrd and Tuggle showing Defendant affirmatively knew he was signing HUD-1 forms with different buying and selling prices: according to Byrd, she walked Defendant through the differing numbers and according to Tuggle, Defendant admitted he knew the buying and selling prices did not match (Court File No. 38, p. 24, 62-63). The Government also offered evidence Defendant received excess funds from the mortgage lenders and from the return of his down payments (*id*. at 24, 28, 63).[3] The evidence showed Defendant collected and cashed the checks–proceeds of the excess funds and used

---

[3] In fact, Snyder's testimony suggested Defendant knew the sales price and HUD-1 price were different, though she consistently stated Defendant did not know there was more than one HUD-1 form. (*Id*. at 84, 101.)

9

some of the funds for all-terrain vehicles and renovations to his own home. That Defendant was receiving cash back from his mortgages, which is not a common occurrence, in combination with the testimony as to Defendant's knowledge, confirms that a rational juror could find Defendant guilty of the offense beyond a reasonable doubt. The Fifth Circuit affirmed a factually similar conviction in *United States v. Swaim*, 757 F.2d 1530 (5th Cir. 1985). There, the defendant was charged under 18 U.S.C. § 1001 with concealing the purchase price of a building in order to obtain a loan more than $600,000 greater than the true, lower purchase price. *Id*. at 1532. The Fifth Circuit held:

> [Defendant] Swaim's use of the false loan closing statement to document and justify the $2,225,000 loan amount, his causing the "true" closing statement to carry a camouflaged disbursement hiding his conversion of the $612,000 overage to his own use, and his admission to [a testifying co-defendant] he had willfully concealed the true purchase price from the Association in order to get a loan larger than the purchase price were sufficient to allow the jury to conclude that he had concealed and covered up the true purchase price by trick, scheme, and device. Swaim's protestation to the contrary is but an attempt to reargue the facts, selecting only those favorable to his position. . . . The evidence adduced on the concealment issue is sufficient to avoid reversal under this standard.

*Id*. at 1533.

In terms of establishing materiality and jurisdiction, the Government presented to the jury a sample HUD-1 settlement statement which included certification language: "a warning that it may be crime to make a false statement on this HUD form."[4] By the testimony of two witnesses, Byrd

---

[4] The Government pointed out in its opening argument the acknowledgment/certification statement on the HUD-1 form, and showed the form to the jury on a slide:

> I have carefully reviewed the HUD-1 settlement statement, and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.

(Court File No. 38, p. 7-8.)

10

and Michael Sund (a representative from one of the defrauded lenders), the Government established that HUD-1 forms were required in closings under federal law and were important in the closing, to the mortgage process, and to the lender's decision. The Government also elicited testimony from codefendant Snyder that she "agreed this was a matter within the jurisdiction of HUD." (Court File No. 38, p. 94.)

In *United States v. Lutz*,[5] 154 F.3d 581, 589 (6th Cir. 1998), the Sixth Circuit considered

---

> The Government also noted, [A]t the bottom of [the HUD-1] there is this little line . . . it says, "It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction," *et cetera*. So there is a warning there that it may be a crime to make a false statement on this HUD form.

(*Id.*) This is obviously not evidence but it pointed the jury to a similar certification on the forms Defendant signed.

In response to questions, Byrd called the HUD-1 a "very important document" and explained its purpose to the jury: the form "explained the purchase price . . . and the loan amount to all parties involved, and it breaks down all truth in lending settlement fees, which go against annual percentage rates. Explains your – all your charges." (*Id.* at p. 23-24.) Michael Sund, testifying for a defrauded lender, underscored the importance of a HUD-1 in deciding on the amount to lend and in confirming the loan's validity (*id.* at p. 47-50).

[5] Defendant does not raise it, but this Court must deal with the Sixth Circuit precedent *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). There, defendant Truth E. Lutz was convicted of violating 18 U.S.C. § 1001 when she, as a loan originator, submitted reports to HUD which falsely stated she had in-person meetings with loan applicants as required by HUD regulations. 154 F.3d at 586. Under the regulations, Lutz first had to submit her applications to a bank for underwriting before transmitting the applications to HUD. *Id.* After processing by the bank, Lutz would transmit the applications to HUD for HUD to guarantee.

Timing was the main issue in *Lutz* – if HUD was held to obtain jurisdiction when Lutz filed her applications with the underwriter, the charges against her would be time-barred. If HUD was held to obtain jurisdiction when Lutz filed her applications with the agency itself, she could be prosecuted under 18 U.S.C. § 1001. The Sixth Circuit decided that HUD obtained jurisdiction when Lutz finally submitted the reports to HUD, reasoning that jurisdiction arises "when the agency has the power to exercise authority in a particular situation." *Id.* at 586-87. Since HUD did not control the underwriting process, the matter was not within its jurisdiction at that time and the crime was not complete. *Id.* at 587.

11

whether false statements on a HUD form that was not ever submitted to HUD (the forms were not part of the final loan package but were part of an interim step) were "material" for purposes of 18 U.S.C. § 1001. *Id*. at 588. The court looked at the Government's evidence, which addressed the policy behind the forms – to provide HUD with "a more complete financial picture of the applicant." *Id*. The Sixth Circuit held, "[e]ven if HUD does not rely on the certification statement [which Lutz falsified] directly, the statement still is material because it has a natural tendency to influence. . . . Therefore, the government was not required to show that the form itself went to HUD in order to establish that the false information on the form was material." *Id*. Here, the Government presented evidence of the importannce of HUD-1 forms to the home-buying and home-financing process, sufficient that a rational juror could decide, beyond a reasonable doubt, that Defendant was guilty of false statements within the jurisdiction of a federal agency.[6]

Because Defendant has not shown the evidence was insufficient to support a guilty verdict on any count, the Court will **DENY** Defendant's motion (Court File No. 37) for judgment of

---

This Court finds *Lutz* distinguishable because HUD policy in *Lutz* specifically disavowed the loan applications until they had been processed through a bank. *Id*. Here, HUD's policy is disclosure-based; the purpose of the HUD-1 settlement form is to provide more effective disclosure to home-buyers and sellers of settlement costs. 12 U.S.C. § 2601(b)(1). The offense here is providing a false HUD-1 at settlement, in violation of RESPA's specific disclosure and truth-in-lending goals. Unlike *Lutz*, this act constitute the entire offense.

[6] This conclusion is especially true given this Court's standard of review. Defendant moved for acquittal only at the close of the Government's case, and did not renew the motion at the close of all evidence. Under such procedural circumstances, appellate review tests only for a "manifest miscarriage of justice," *United States v. Hernandez*, 227 F.3d 686, 694 (6th Cir. 2000), which only exists if the record is "devoid of evidence pointing to guilt." *United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998). Since the Court reserved judgment on the issue of jurisdiction, the Court only looks at the evidence on record at the close of the Government's case. Fed. R. Crim. P. 29(b); *Finn*, 375 F.3d at 1037. Considered in the light most favorable to the Government, the Court finds there is little possibility of a "manifest miscarriage of justice" and the evidence is sufficient for supporting the jury's finding on materiality and HUD jurisdiction.

acquittal or for a new trial.

### C. Conviction Under 18 U.S.C. § 1001

Defendant seeks acquittal or a new trial because "[t]he law and evidence do no [*sic*] support convictions under 18 U.S.C. Section 1001 as the statute is inapplicable to completion of false HUD 'Settlement Statement' forms." (Court File No. 39, ¶ 2.) The Defendant cites no authority and does not flesh out this argument. However, in making his initial Rule 29 motion, Defendant objected to the "jurisdiction" element of Section 1001, stating that the Government's proof was deficient as to jurisdiction because HUD did not guarantee or subsidize the loans and never really became involved with the HUD-1s (Court File No. 38, p. 72-73).

In its response, the Government cites language from the United States Court of Appeals for the Second Circuit, which this Court used in developing the jury charge concerning false statements. As the Second Circuit noted in *Davis*, "jurisdiction" does not require a false statement be made to or submitted to a federal agency. *Davis*, 8 F.3d at 928-29. A violation of § 1001 may be proved by evidence showing "it was contemplated that the statement was to be utilized in a matter which was within the jurisdiction" of the federal agency, and an agency has jurisdiction "when it has the power to exercise authority in a particular situation, as distinguished from matters peripheral to the business of that body. . . . It is the mere existence of the federal agency's supervisory authority that is important to determining jurisdiction." *Id*. (internal citations omitted). Under the language of *Davis*, in assessing whether the element of jurisdiction has been established in this case *as a matter of law*, the Court must evaluate whether HUD "has the power to exercise authority" in relation to HUD-1s. After analyzing the statute and the policy behind it, this Court finds HUD does have jurisdiction.

13

First, as the Government cited, HUD did not need to actually receive the HUD-1 forms to have jurisdiction over them. *Davis*, 8 F.3d at 928-29; *see also Gibson*, 881 F.2d at 322 ("There is no implicit requirement that the statements be made directly to, or even be received by, the federal department or agency."). However, the Secretary of HUD may actually obtain HUD-1s. Pursuant to the statute and regulations, after closing, the borrower, seller, and lender each receive a copy of the HUD-1 form; the lender is required to retain the form for five years. 24 C.F.R. § 3500.10(e). If a mortgage is sold, the acquiring mortgage holder must maintain the HUD-1 for the balance of the five-year period. *Id*. The Secretary of HUD may inspect or obtain copies of HUD-1s held by lenders at any time. *Id*.

Second, HUD need not necessarily "get involved" with the false HUD-1s in order to assert jurisdiction over them. *See Gibson*, 881 F.2d at 322 (Sixth Circuit affirmed defendant's conviction under § 1001 for false invoices submitted to a private mining company which contracted with TVA; defendant did not have a direct relationship with TVA but the invoices submitted by defendant had purchase numbers assigned by TVA). In *Gibson*, the Sixth Circuit noted that "federal departments and agencies have 'the power to exercise authority' in a great many matters not completely controlled by those departments or agencies . . . So long as the statements are material . . . false statements made in any such matter are within the scope of § 1001." *Id*. (citations omitted). Defendant does not challenge the materiality of the inflated purchase prices.

In terms of whether HUD "has the power to exercise authority" over HUD-1s, the Court recognizes that HUD-1 forms are required under the Real Estate Settlement Procedures Act ("RESPA"), and its implementing Regulation X. RESPA was enacted in 1974 to protect consumers

from high settlement charges and inconsistent practices.[7] According to RESPA's goals, RESPA was intended to "result in more effective advance disclosure to home buyers and sellers of settlement costs." 12 U.S.C. § 2601(b)(1). HUD-1s are a key part of this disclosure process: they must be provided at or a day before settlement and must succinctly explain to a home buyer and seller the charges and fees that will be incurred in the transaction. 12 U.S.C. § 2603; 24 C.F.R. § 3500.8. The HUD-1 is a universal document – under RESPA, a settlement agent must use the HUD-1 to itemize charges in *every* closing "involving a federally related mortgage loan in which there is a borrower and a seller." *Id*. The HUD-1 form reflects a policy concern of Congress, as implemented through HUD, to render the financial side of a home sale transaction understandable to all parties, and not just the closing experts and lenders. HUD regulations permit few changes to the format of a HUD-1. 24 C.F.R. § 3500.9.

The Secretary of HUD is authorized to enforce RESPA, and RESPA compliance is a current HUD priority. 24 C.F.R. § 3500.19.[8] A recent enforcement example concerns the Chicago Title

---

[7] 12 U.S.C. § 2601(a): "Congress finds that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country."

[8] *See also Title Insurance: Cost and Competition, Hearing Before the H. Comm. on Fin. Servs., Subcomm. on Housing and Cmyy. Opportunity*, 109th Cong. (Apr. 26, 2006) (statement of Gary M. Cunningham, Dep. Asst. Sec., Regulatory Affairs, HUD) In testimony before the House Subcommittee on Housing and Community Opportunity, Deputy Assistant HUD Secretary Gary M. Cunningham stated plainly, "[e]nforcement of [RESPA] is a high priority of Secretary Jackson. . . We view RESPA enforcement as a very important part of HUD's mission to increase homeownership and help provide affordable housing opportunities. . . . RESPA covers millions of transactions every year, as its coverage extends to virtually all loans . . . RESPA's jurisdiction extends to all providers of settlement services required to close the loan.").

Insurance Company ("Chicago Title").[9] HUD co-operated with the Office of the Comptroller of the Currency and the Office of Thrift Supervision to investigate a settlement agent which was allegedly falsifying HUD-1 forms. The three agencies assessed a $5 million penalty against Chicago Title for providing inaccurate HUD-1 settlement statements to borrowers and federally insured depository institutions. The settlement agreement notes, "HUD is charged with the administration and enforcement of [RESPA]" and cites 12 U.S.C. § 2603(a). As the Government argued, there is "no point" in "having federal law require these HUD-1 forms, these settlement statements, if they're not within the jurisdiction of a federal agency. . . . [T]hat it's promulgated pursuant to a federal statute and required by federal law makes it a matter within the jurisdiction of the agency charged with enforcing that statute." (Court File No. 38, p. 74-75.)

Finally, this Court notes that HUD-1s are critically important documents because they inform secondary mortgage buyers of the terms of the loan they buying. HUD-1s "travel from the closing room into the stream of commerce where, foreseeably, others, such as lenders, will rely on them. Real estate specialists know a HUD-1 is probably the most important document in the closing package."[10] The secondary mortgage market in the United States is huge – in 2004, Fannie Mae and Freddie Mac issued mortgage-backed securities worth more than $2.7 trillion. *See* Fed. Reserve, *GSEs, Mortgage Rates, and Secondary Market Activities*, Working Paper No. 2006-30 (Sept. 8, 2006). Buyers, sellers, borrowers, lenders, and secondary market participants all rely on the

---

[9] The settlement agreement and a HUD press release describing the investigation are available on HUD's website, http://www.hud.gov/offices/hsg/sfh/res/chicagosettl.pdf. *See also* HUD News Release No. 05-021, Feb. 28, 2005, *at* http://www.hud.gov/news/release.cfm?content=pr05-021.cfm.

[10] 16 John Freeman, *HUD-1 Misery*, S. Carolina Lawyer 7, 8 (2004).

accuracy of HUD-1s in making decisions, and HUD is the closest agency to the form. Therefore, for the foregoing reasons, as a matter of law and common sense, the Court finds HUD has jurisdiction over HUD-1 forms and therefore Defendant's prosecution under 18 U.S.C. § 1001 was proper.

**D.     The *Pinkerton* Charge**

Defendant now objects to the Court charging the jury under *Pinkerton*, which provides that a defendant may be liable for his co-conspirators' acts or offenses committed in furtherance of the scheme, even if the defendant did not participate in or even know of such acts. *Pinkerton*, 328 U.S. 646-47 (1946); *United States v. Davis*, 809 F.2d 1194, 1203 (6th Cir. 1987). The Court first notes it only gave an explicit *Pinkerton* charge as to Counts Three and Four (Court File No. 38, p. 116-17). The Court raised this issue with defense counsel during the charging conference, and counsel then expressed no reservation as to the charge in reference to these counts (*id.*). Under Fed. R. Crim. P. 30(d), a party objecting to the intended jury instructions or to the Court's failure to give a requested instruction must inform the Court of its specific objection before the jury retires to deliberate. Therefore, the Court concludes Defendant waived any objection to the propriety of the charge since he withdrew his objection during the charging conference. *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006); *United States v. Houston*, 205 F. Supp. 2d 856, 871 (W.D. Tenn. 2002).

If the Court were to consider Defendant's objection on its merits, the Court would cite the binding precedent of this circuit, which uniformly upholds *Pinkerton* as an appropriate theory of accomplice or conspiratorial liability. *See*, *e.g.*, *United States v. Myers*, 102 F.3d 227, 238 (6th Cir. 1996); *United States v. Martin*, 920 F.2d 345, 348 (6th Cir. 1990); *Davis*, 809 F.2d at 1203; *see also Birnie*, 193 F. App'x at 536 (citing *United States v. Wilson*, 506 F.2d 1252, 1257 (7th Cir. 1974)

("[i]t is not essential that the indictment contain a separate count charging conspiracy in order to take advantage of the doctrines peculiar to conspiracy")); *United States v. Lopez*, 271 F.3d 472, 480-81 (3d Cir. 2001) ("we have little difficulty following our sister circuit courts of appeals in determining that a conspiracy need not be charged in order for *Pinkerton*'s doctrine to apply").

With reference to the wire fraud counts, the Court instructed the jury, "[o]nce a person having knowledge of the general nature of the scheme knowingly joins in and participates in the scheme, then that person becomes responsible for all actions involved in the scheme. . . . [as long as ] the actions [are] reasonably foreseeable and within the scope of the scheme." This instruction is distinguishable, though not dissimilar from the *Pinkerton* charge. The elements on which the jury was instructed have been upheld in other prosecutions for wire or mail fraud schemes. *E.g.*, *Birnie*, 193 F. App'x at 536; *United States v. Horton*, 847 F.2d 313, 319 (6t h Cir. 1988) (citing *United States v. Bibby*, 752 F.2d 1116, 1124 (6th Cir. 1985)).

Therefore the Court finds no merit in Defendant's argument and no error in this jury instruction, and no acquittal or new trial is warranted on this ground.

### E. The Sixth Circuit Pattern Jury Instruction on Wire Fraud

Finally, Defendant alleges the Court erred in not giving the Sixth Circuit Pattern Jury Instruction on Wire Fraud. The Court acknowledges Defendant requested this instruction at the eleventh hour (Court File No. 38, p. 116), but the Court gave its own standard wire fraud instruction, tailored to the facts of Defendant's case.

As the Government points out, "[t]here is no requirement that the Court use the Pattern Jury Instructions." (Court File No. 39, p. 2.) The Government correctly notes the "contents of the charge given by the Court have been previously approved by the Circuit" and the content of the Pattern

Instructions "awaits case-by-case review by the court of appeals." (*Id.*); *see also United States v. Sherrod*, 33 F.3d 723, 725 (6th Cir. 1994) (citing Sixth Circuit Dist. Judge's Ass'n, Criminal Pattern Jury Instructions at *vii* (1991 ed.)).

This Court has broad discretion in drafting jury instructions. *United States at Moore*, 129 F.3d 873, 876-77 (6th Cir. 1997). The standard for jury instructions is "whether they fairly and adequately inform the jury of relevant considerations and explain the applicable law to assist the jury in reaching its decision." *United States v. Prince*, 214 F.3d 740, 760 (6th Cir. 2000) (citing *United States v. Layne*, 192 F.3d 556, 574 (6th Cir. 1999); *United States v. Harrod*, 168 F.3d 887, 890 (6th Cir. 1999)). A jury verdict will only be reversed based on improper instructions "if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Prince*, 214 F.3d at 761 (citing *Harrod*, 168 F.3d at 892 (quoting *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72-73 (6th Cir. 1990))). As long as the instructions given by the Court "substantially cover" the same material as the pattern instruction requested by Defendant, there is no reversible error. *United States v. Mason*, 126 F. App'x 702, 706 (6th Cir. 2005); *Scott v. Mitchell*, 209 F.3d 854, 883 (6th Cir. 2000).

Here, this Court gave a wire fraud instruction stating, in essence:

> What must be proved beyond a reasonable doubt is that the defendant, with intent to defraud, knowingly and willfully devised, intended to devise, or participated in, a scheme to defraud substantially the same as the one alleged in the Indictment; and that the use of the interstate wire communications facilities was closely related to the scheme because the defendant either used, or caused to be used, wire communications facilities in interstate commerce in an attempt to execute or carry out the scheme.

The Sixth Circuit Pattern Jury Instruction states the Government must prove beyond a reasonable doubt,

> First, that the defendant knowingly participated in, devised, or intended to devise a scheme to defraud or to obtain money or property by false or fraudulent pretenses,

19

representations, or promises; second, that the scheme included a material misrepresentation or concealment of a material fact; third, that the defendant had the intent to defraud; and fourth, that the defendant used or caused to be used wire communications in interstate commerce in furtherance of the scheme.

Sixth Circuit Dist. Judge's Ass'n, Criminal Pattern Jury Instructions § 10.02 (2005 ed.). In comparing these charges side by side, this Court finds the instruction it gave "substantially covers" the same material as the pattern instruction and, therefore, there is no error.[11]

IV. CONCLUSION

Accordingly, the Court finds no basis for vacating the jury's verdict and ordering a new trial and will **DENY** Defendant's alternative motion for a new trial (Court File No. 56).

An Order will enter.

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[11] *See United States v. Birnie*, 193 F. App'x 528, 537-38 (6th Cir. 2006) ("[T]he district court's instruction on wire fraud correctly stated the elements of the crime. There is no requirement that each defendant make a material misrepresentation. [Defendants'] requested instruction was unnecessary, and it incorrectly applied language from *Daniel* to a scheme to defraud involving multiple defendants. Therefore, the court did not abuse its discretion in rejecting the proposed instruction.").